No. 31,883

ED HUFFMAN, *Appellant,* v. LARUE C. WILKES, LEON SHANTON, LEE CARSON and FRED GASSER, *Appellees.*

(37 P. 2d 988)

Opinion filed December 8, 1934.

C. E. Pile, of Parsons, for the appellant.

*Sullivan Lomax,* of Cherryvale, *John Bertenshaw* and *Kirk C. Veeder,* both of Independence, for the appellees.

The opinion of the court was delivered by

Johnston, C. J.: Ed Huffman made a deposit of $1,977.04 in the Montgomery County National Bank at Cherryvale, and when he presented a check on May 2, 1931, for the amount of the deposit the teller began making provision for the payment, when he was interrupted by the directors in charge of the bank.

In the amended petition it is alleged that Larue C. Wilkes, Leon Shanton, Lee Carson and Fred Gasser, directors of the bank, took the check from the teller and went into an adjoining room and, after consulting together for a time, Wilkes came out and said, "Ed, what on earth is the matter?" Plaintiff said, "Nothing, but I want my money. My father is very sick and I'll have to use some money at any time." Wilkes said, "Well, Ed, there is no trouble with the bank. We've been having some trouble with Dillman. He loaned too much money and we've just been putting him out. This bank is all right." Huffman said, "Well, I want my money, for I can use it." Wilkes stood for a moment and said, "Well, I'll see what we will do about it." Wilkes returned to the room in which were Shanton, Carson and Gasser, and closed the door; that soon thereafter Shanton came out and said to plaintiff, "Ed, I do not know whether we can pay you all of this check to-day or not. I'll let you know soon." That Shanton then went back into the room where defendants were and soon thereafter a stranger came through the door and Shanton was with him; that the stranger turned back into the room where the defendants were, and Shanton then said to plaintiff, "Ed, this bank is all right, it's worth one hundred cents on the dollar. You know it is backed by the Federal Reserve." Plaintiff went outside the bank a few moments and then returned; that during these transactions said directors were in control and possession of the check presented by plaintiff; that when plaintiff returned into the bank, defendants Gasser and Shanton were talking and Gasser said to plaintiff, "Why do you want your money? We've been having some trouble with Dillman, but the bank is through with him." Plaintiff said, "It's none of my business what you are doing with Dillman. I just want my money." Gasser said, "Well, I've got more money in this bank than you have and this bank is all right." Gasser then returned through the door and as he did so Shanton began to cry and said, "Well, Ed, Dillman has brought this on." Plaintiff made no reply and Shanton proceeded

to perform other acts which this plaintiff cannot particularly specify; that while defendants were in the room Shanton stated to Wilkes, Carson and Gasser, "We are turning down one of the best friends we've got." Plaintiff cannot state the exact time said statement was made; that said Wilkes again came to this plaintiff who was standing to one side in said banking room and said, "Ed, we've got twenty-five hundred dollars at Independence and we will pay you your money the first thing Monday morning." Plaintiff replied, "I want my money now." Defendant turned away from this plaintiff; that plaintiff continued in the bank until about the hour of 3:15 p. m., at which time Shanton came to plaintiff and said, "Well, Ed, it's after quitting time and we'll have to close." That thereafter plaintiff left the premises of the bank and the defendants kept and retained the money of plaintiff in the sum specified in the check; that the defendants, and each and all of them, performed said acts severally, jointly, willfully, wantonly, intentionally, unlawfully and in conspiracy, each with the other, to then and there prevent the delivery of and to refuse the delivery to plaintiff of the amount of money specified in said check; that either Wilkes or Shanton handed the check back to plaintiff, and because of the fact he had indorsed the check, plaintiff tore it up and deposited the pieces in some receptacle in the bank; that during the time plaintiff was in the bank, the bank was receiving deposits and was paying and cashing checks of other customers and depositors in the usual and regular manner; that the bank then and there had sufficient funds in currency and coin of the United States to have cashed plaintiff's check and delivered to him in money the sum therein specified; that by reason of the unlawful acts of defendants and each and all of them as hereinabove stated, plaintiff was prevented from receiving his money on the check and there is now due and owing to him thereon $1,865 with interest at six per cent per annum from September 1, 1932; that plaintiff has demanded from the defendants, and each and all of them, the payment of the sum, and the defendants have failed, neglected and refused to pay the sum to this plaintiff.

Plaintiff further alleged that it was the duty of the defendants, and each and all of them, then and there to have delivered to plaintiff the sum of $1,977.04, and it was the duty of the defendants to have permitted and assisted the teller of the bank to deliver the sum to plaintiff, and it was the further duty and lawful

responsibility of the defendants, at that time and place, not to have interfered with the teller, and forthwith then and there to have caused the check to be paid in full to plaintiff.

In the second cause of action the averments of the first cause of action are pleaded by reference as though fully rewritten therein, but plaintiff alleges he has been further damaged in that he has necessarily spent a period of thirty days in his efforts to recover his money from the defendants and the bank. Plaintiff alleges that he is an oil-well driller by trade and his time was and is reasonably worth the sum of seven dollars per day; that he has been damaged by the loss of thirty days' time in the sum of two hundred ten dollars ($210); that a fair and reasonable attorney's fee for professional services in preparing and presenting this action is the sum of $500; that by reason of the failure and interference with the payment of the money, the preventing of delivery of the sum specified in the check, he has been prevented from receiving and taking it from the bank.

Plaintiff alleges that the acts, words and conduct of the defendants in the bank at the time and place mentioned continued for about one and one-half hours, and that during that time the defendants were in each other's presence or acting and conversing with each other and approving the acts and words and conduct of each other, and that by such acts, words and deeds they then and there, each with a common and several intention to so do, willfully, fraudulently and unlawfully prevented plaintiff from receiving his money from the bank; that in the several refusals to pay the check, in taking said check out of the control of the teller, in taking it away from the bank counter and consulting concerning it, they were then turning down one of their best friends and thereby compelling plaintiff to remain out of possession of his money after he had presented his check; that by reason of their conduct plaintiff was directed and compelled to withdraw from the bank at the hour of 3:15 p. m. and left without his money, and the defendants then and there remained in the unlawful, physical control and possession thereof, in the sum of $1,977.04, and for this punitive damages are asked in the sum of $5,595. The full amount asked on the second cause of action is $6,305, and costs.

Thereafter the defendants filed a joint and several demurrer stating that the second amended petition failed to state facts sufficient to constitute a cause of action in favor of plaintiff and

against the defendants or any of them. This demurrer was sustained, and the appeal followed.

It has been determined that a general demurrer admits all well-pleaded facts in the petition. The plaintiff stated the making of the deposit, $1,977.04, and that later he came to the bank and made a check demanding payment of the money. While the teller was preparing for a delivery of the money, the president and directors of the bank intervened, and after a long parley they prevented the payment of the check.

Plaintiff alleged that the bank was open for business, money was being deposited and checks being paid, and numerous assertions were made, by the cashier and other defendants, that the bank was sound.

Plaintiff was baffled until the time to close for the day had arrived, about three o'clock, and, after several meetings of the directors in a separate room and a continual assertion that the bank was sound and good and was all right, he was told he would be paid the following Monday, indicating that they were playing for time in the hope that by the fourth the stringency would be overcome, if there was a stringency. These things were pleaded and by the general demurrer admitted to be true. The interference of the directors, who had absolute control of the bank and the employees, stopped the payment of the check. They obtained possession of the check from the teller before the teller could pay the demand, and finally returned the check without payment of money, and plaintiff was sent away without the money demanded.

Defendants assert that the bank was in a failing condition at the time and proceed to argue the case on that assumption, but that is contrary to the facts alleged in the petition. The defendants insisted the bank was all right. It was open and was receiving deposits and paying checks to other customers in the usual way when the demand by plaintiff was made. They had had trouble with one Dillman, but had got rid of him. He had made loans of which they did not approve, and they had removed him from the bank. They told plaintiff the bank was all right. While the bank was said to be all right, they acted as if they feared they might become short of money or it might result in embarrassment if they honored the demand. But a fear that payment of such a sum would imperil the solvency of the bank in the future was not a defense,

since the bank was open, doing business, receiving deposits and paying checks at the time. It may be that when an answer is filed and the evidence is produced a different case will be established than was alleged in the petition, but the allegations of solvency were made, and it was alleged the bank was a going concern, doing business in the usual way, and that there was sufficient money in the bank to have redeemed the check. The defendants acted in harmony in preventing the teller from cashing the check, taking it from his possession and having a private meeting of the directors and owners of the bank. The conspiracy to avoid payment was alleged, the method of accomplishing it was stated. They first told him it was a problem with them about paying all of the check on that day, but having admitted the bank was all right, and being open and transacting business as usual, their duty to pay the check was plain.

There is an implied contract that a genuine check issued by the depositor shall be paid by the bank, and if refused a cause of action will immediately arise. (*Kleopfer v. Bank*, 65 Kan. 774, 70 Pac. 880.)

In 3 R. C. L. 567 it is said:

"The implied contract between a bank and its depositor is that it will pay the deposits when and in such sums as are demanded. Whenever a demand is made by presentation of a genuine check in the hands of a person entitled to receive its amount, for a portion of the amount on deposit, and payment is refused, a cause of action immediately arises."

The rule is the same as to liability of directors of a bank who take charge of a check and exercise authority over the teller, and while insisting the bank is sound and has money to pay the check, fail to do so. Here for some reason they chose to break the implied contract.

The court in *Ramsey Petroleum Co. v. Adams*, 119 Kan. 844, 241 Pac. 433, quotes from Magee on Banks and Banking, 3d ed., 98, as follows:

" 'The law imposes certain duties which are obligatory and from which a director cannot be excused. A failure to perform duties which the laws impose makes the director who willfully neglects such duty, after being fully qualified in office, liable in civil damages to the person, or persons, injured by such gross neglect.' " (p. 850.)

As to the right of a depositor to substantial damages, it was held in *Meinhart v. Farmers State Bank*, 124 Kan. 333, 259 Pac. 698, that:

"A depositor whose checks are intentionally dishonored by a bank when he has funds therein sufficient to meet them may, upon reasonable proof of injury to his credit on account of such dishonor of checks, be entitled to substantial instead of nominal damages, to be determined by the jury, even if he is not a merchant or trader." (Syl. ¶ 4.)

*Cassidy v. Uhlmann*, 170 N. Y. 505, 63 N. E. 554, was an action by a person holding unpaid bank-deposit claims. It was brought against the president and two directors and was based upon their action in permitting the bank to remain open for business after becoming insolvent. During investigation of the bank's affairs one of the directors, at a meeting of the board on August 2, 1893, remarked that "the bank is busted." They did not close the bank, but continued as a going concern, doing business in the usual way until the closing hour on August 8, six days after the above-quoted statement had been made in the meeting of the board of directors. The deposits for which the suit was brought were received by the bank on the 7th and 8th days of August. The plaintiff recovered against the directors on their personal and individual liability. The court held:

"Where a bank director has absolute knowledge that the bank is hopelessly insolvent, and fails to take such steps as lie in his power to close the bank for business, and takes part in any arrangement which permits the bank to be kept open, and deposits to be received, he is personally liable for damages to a depositor who is ignorant of the insolvency, and whose deposits were thereafter received, though the director had expressed an opinion that deposits should not be received, and an arrangement had been entered into for their receipt under proper restrictions, where such arrangement was subsequently abandoned." (63 N. E. 554, syl. ¶ 1.)

Under the facts admitted by the demurrer in which the bank directors acted together to defeat the obtaining of the money, all the directors who united in defeating the payment are liable for damages, and, therefore, the judgment is reversed, and the cause remanded with direction to overrule the demurrer.